**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EQUITRANS SERVICES, LLC, and | ) | |
| EQUITRANS INVESTMENTS, LLC, | ) | |
| trading as EQUITRANS, LP, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 13-1727 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| PRECISION PIPELINE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I.   MEMORANDUM

Pending before the Court are a motion for summary judgment (Doc. 36) filed by

Plaintiffs Equitrans Services LLC and Equitrans Investments, LLC, trading as Equitrans, LP

(collectively, "Equitrans") and a cross-motion for partial summary judgment (Doc. 40) filed by

Defendant Precision Pipeline ("Precision").  For the reasons that follow, the parties' motions will

be granted in part and denied in part.

### BACKGROUND

A.   The Contract

This civil action arises from a contractual dispute concerning a pipeline construction

project known as the "Sunrise Project" (hereafter, the "Project").  The Project involved the

construction of approximately 45 miles of natural gas pipeline through Green County,

Pennsylvania and Wetzel County, West Virginia.  (DSMF at ¶ 1.)[1]

---

[1] References to "DSMF at ¶___" refer to Defendant's Statement of Undisputed Material Facts
(Doc. 42) and Plaintiff's responses thereto (Doc. 49).

In June 2011, the parties entered into a contract relative to the Project (hereafter, the "Contract"), pursuant to which Equitrans agreed to pay Precision an estimated base contract price of $75,358,176.54 for its construction of the pipeline. (See Compl. at ¶ 9, Doc. 1-2; Notice of Removal at ¶ 1, Doc. 1.) The Contract was comprised of a Master Construction Services Agreement ("MSA"), the Sunrise Project Pipeline Construction Specification ("Project Specifications"), the EQT Pipeline Construction Standard, alignment sheets, and erosion and sedimentation control plans, all of which Precision was required to follow during construction. (DSMF at ¶ 13; Def.'s Ex. 8-19 (Doc. 43-8), Ex. 8-25 (Doc. 43-10), Ex. 8-22 (Doc. 43-9), Ex. 8-58 (Doc. 43-12), and 8-60 (Doc. 43-13).)

The dispute in this case centers primarily on the meaning and application of certain warranty and indemnification provisions in the Contract. One key warranty provision is Section 8.1 of the MSA, entitled "Warranty of Work," which states:

> Contractor warrants its Work against all deficiencies and defects in materials and/or workmanship and as required for [sic] in the Contract Documents. Contractor shall guaranty or warrant its Work for a period of one (1) year from the date of substantial completion of its Work.

(Def.'s Ex. 8-19, Doc. 43-8.) Another key warranty provision is Article 64 of the Project Specifications, wherein Precision warranted its earthwork as follows:

> Contractor shall warrant all earthwork for a period of **fifteen (15) months** after the retention has been accepted. Earth work shall cover all trench subsidence, any slips or slides and excessive erosion attributable to the improper installation of erosion control devices. ... Contractor agrees to remobilize to repair any earthwork or piping defect **within fourteen (14) calendar days** after receiving written notification that a project defect is attributable to the Contractor's workmanship or materials.

(Def.'s Ex. 8-25, p. 52, Doc. 43-10 (emphasis in the original).) Of potential relevance to these warranty obligations is Section 9.7 of the MSA, "Quality of Work," which states:

Contractor will comply with the Contract Documents as they may be modified, will complete the Work in a good and workmanlike manner free from defects and will use the skill and judgment customarily utilized in the trade of Contractor in performing the Work. The Work will at all times meet the approval of the Company. Contractor will inspect all surfaces prior to commencing work. Contractor will not commence work until deficiencies and other surface/subsurface conditions that would adversely affect the integrity of Contractor's completed Work have been corrected. Contractor shall inform Company immediately should any surface/subsurface be unacceptable to commence or continue the Work. Contractor's start of the Work constitutes Contractor's acceptance of the existing surfaces and conditions.

(Def.'s Ex. 8-19, Doc. 43-8.)

Precision also assumed the following indemnity obligations pursuant to Section 12.1 of

the MSA:

> To the fullest extent permitted by law, Contractor shall defend, indemnify, and hold harmless [Equitrans], its parent, subsidiaries, affiliates, co-owners, co-lessees and their partners, directors, officers, employees, agents, successors and assigns ("Indemnitees") from and against any and all claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including attorneys' fees and other costs of defense (hereinafter "Claims and Expenses") arising out of or resulting from Contractor's Work or other performance under this agreement and/or attributable to: (a) the negligent or willful act or omission of Contractor, its subcontractors, suppliers, employees, agents or invitees, or anyone acting under Contractor's direction or control in connection with the performance of the Work or for whose acts Contractor may be liable, or anyone acting under contractor's direction or control in connection with the performance of the Work or for whose acts Contractor may be liable; (b) breach by Contractor of any representation or warranty of Contractor; (c) Contractor's failure to comply with any provision of this Agreement or the Contract Documents; (d) if Contractor transports or hauls Company property (including loading and unloading), any resulting damage or loss; or (e) contractor's failure to comply with Applicable Laws, Safety Rules, or Permits (defined below), including without limitation any corrective measures which may be required.

(Def.'s Ex. 8-19, Doc. 43-8.)

B. The Slope Failures

It is undisputed that, following the completion of construction, twenty-nine (29) slides

occurred along parts of the right-of-way that Equitrans had obtained for construction of the

pipeline. (DSMF at ¶ 19.) Equitrans notified Precision of these occurrences and demanded that the slides be repaired. (PSMF at ¶¶ 43, 45.)[2] Precision repaired some of the slides, but, as to certain others, Precision offered to make repairs only on a time and materials basis. (PSMF at ¶¶ 46-47.) Equitrans understood that it was contractually obligated to restore each landowner's property along the right-of-way, so it repaired those landslides that Precision did not repair. (Id. at ¶¶ 40, 48.) Equitrans states that it incurred $6,743,851.14 in damages for repairing slips and slides on the Project. (PSMF at ¶ 85.)

C. The Road Work

Equitrans alleges that it provided road bonds to municipalities and local government agencies in order for Precision to utilize certain public roads in connection with its work. (Compl. at ¶ 19, Doc. 1-2.) According to Equitrans, PennDOT and the municipalities demanded that the roads be restored to their pre-construction condition before Equitrans would be released from its road bonds. (Id. at ¶¶ 23-24.)

Pursuant to the EQT Pipeline Construction Standard – an element of the parties' Contract, Precision agreed that: "Contractor shall be responsible for maintaining and repairing existing roads such that the condition of the road after construction equals the condition of the road prior to construction." (PSMF at ¶ 79; Pl.s' Ex. O at p. 2121, § 2.2, bullet point 4, Doc. 39-8.) In accordance with the Project Specifications, Precision was required to produce both a pre-construction video of the access roads it would utilize on the Project, capturing their pre-existing conditions, and a post-construction video documenting the as-left condition of the right of way, ancillary sites and access roads restored by Precision. (PSMF at ¶¶ 60-61; Pl's Ex. M at §§19 and 56, Doc. 39-8.)

_____

[2] Citations to "PSMF at ¶___" refer to Plaintiffs' Statement of Material Facts (Doc. 38) and Defendant's responses thereto (Doc. 48).

4

Precision viewed its obligation under these provisions as requiring it to pay for any road damage that it had caused, but not requiring it to pay for road damage caused by others. (PSMF at ¶ 74.) After paying over $1,000,000 toward road repairs, Precision advised Equitrans that it believed these payments had fulfilled its contractual obligations. (Id. at ¶¶ 75-76.) Thereafter, Equitrans paid some $1,292,025.90 in additional road repair costs. (PSMF at ¶ 88.)

D. The Settlement

In June 2013, Equitrans and Precision entered into a Settlement Agreement and Release ("Settlement Agreement") in an attempt to resolve certain claims related to Precision's work on the Project. (DSMF at ¶ 44.) Under Paragraph 6 of the Settlement Agreement, Equitrans agreed to "waive[] any and all claims to any backcharges that it has asserted or could assert against Precision concerning the Project for work completed prior to the date of this Agreement." (Def.'s Ex. 8-97 at ¶ 6, Doc. 43-28.) Paragraph 8 of the Settlement Agreement also contained a broad mutual release clause covering "all claims, counterclaims, rights, demands, costs (including attorney's fees), damages, losses, liabilities, actions and causes of action of every nature and description whether known or unknown..." that either party might have as of the date of the Settlement Agreement. (Id. at ¶ 8.) Notwithstanding this broad release, Equitrans expressly reserved its right "to assert any and all claims that it has or may have in the future against Precision for latent defect and/or warranty and/or indemnity items." (Id.) Precision likewise "reserve[d] all rights to dispute any claims by [Equitrans] related to latent defects and/or warranty and/or indemnity items." (Id.)

E.  <u>This Lawsuit</u>

Equitrans commenced this lawsuit on November 13, 2013, by filing its complaint in the Allegheny County Court of Common Pleas.  (<u>See</u> Notice of Removal at ¶ 2, Doc. 1.)  Thereafter, the case was removed to this Court.  (<u>See</u> Doc. 1.)

The complaints sets forth three causes of action sounding in: breach of contract (Count I); breach of warranty (Count II); and breach of indemnity obligations (Count III).  (<u>See</u> Docs. 1-2.) These counts are all based on Equitrans's assertion that Precision breached its obligations under the contract by failing to remedy slope failures, failing to repair damaged roads, and failing to indemnify Equitrans for the costs it incurred in securing necessary repairs.  Equitrans maintains that it is entitled to summary judgment on all three counts of the Complaint pursuant to the clear and unambiguous language in the Contract.

Precision argues that Equitrans's claims for breach of contract and breach of warranty fail because (1) Precision only warranted against defects in its materials or workmanship and (2) as to all but two of the slides, Equitrans has failed to present evidence sufficient to show that Precision's defective materials or workmanship (as opposed to Equitrans's defective design) caused the slides.  As to Equitrans's indemnity claim, Precision argues that the language of the indemnity clause expressly limits Equitrans to recovering its losses on third-party claims and such losses have not been demonstrated.  Precision further argues that certain of Equitrans's alleged damages were waived by the June 2013 Settlement Agreement.

## ANALYSIS

At the heart of this case lies a dispute about the parties' respective rights and obligations under the Contract. Under Pennsylvania law,[3] "'[t]he fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.'" Indian Harbor Ins. Co. v. F & M Equip., Ltd., 804 F.3d 310, 313 (3d Cir. 2015) (quoting Murphy v. Duquesne Univ., 777 A.2d 418, 429 (Pa. 2001)). The Third Circuit Court of Appeals has summarized the "well established" "division of labor between court and fact-finder when interpreting a contract":

> First, we must determine (as a matter of law) whether contractual language is ambiguous. ... Hutchingson v. Sunbeam Coal Corp., 513 Pa. 192, 519 A.2d 385, 390 (1986). If we determine that the language is unambiguous, we follow its plain meaning. If, however, we conclude that the language is ambiguous, we leave it to a fact-finder to decide its meaning. See Ins. Adjustment Bureau, Inc. v. Allstate Ins., Inc., 588 Pa. 470, 905 A.2d 462, 469 (2006). ...

Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am., 693 F.3d 417, 426 (3d Cir. 2012) (interpreting Pennsylvania and New York law; references to New York law omitted).

Of some relevance here is the fact that the parties' Contract contains an integration clause. (See MSA at § 19.9, Def.'s Ex. 8-19, Doc. 43-8.) Where the parties have entered into an agreement that represents the parties' "entire contract" or an integrated contract, parole or extrinsic evidence is inadmissible to explain or vary the terms of the agreement; however, such evidence is admissible for the purpose of resolving an ambiguity in the contract. See U.S. ex rel. Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am., No. CIV. A. 06-CV-0234, 2009 WL 4730233, at *44 (W.D. Pa. Dec. 4, 2009) (citing Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (stating that "parole evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the

---

[3] There is no dispute for present purposes that the Contract is to be construed and applied in accordance with Pennsylvania law. (MSA at § 19.1, Def.s Ex. 8-19, Doc. 43-8.)

instrument or by extrinsic or collateral circumstances")). "Thus, while a court must interpret an unambiguous contract 'according to the natural meaning of its terms,' a court may 'look outside the four corners of a contract' when interpreting an ambiguous contract." Id. (quoting Bohler–Udeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir.2001)).

A contract is ambiguous if it "'is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.'" U.S. ex rel. Greenmoor, Inc., 2009 WL 4730233, at *45 (quoting Bohler–Udeholm America, Inc., 247 F.3d at 93). In determining whether an ambiguity exists, a "'court may consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" Id. (quoting quoting Bohler–Udeholm America, Inc., 247 F.3d at 93). "An ambiguity can be either patent, i.e., on the face of the contract, or latent." Id. A latent ambiguity "'arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" Id. (quoting Bohler–Udeholm America, Inc., 247 F.3d at 93)). "Thus, a latent ambiguity must be based on a 'contractual hook' in that the extrinsic evidence 'must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face.'" Id. (quoting Bohler–Udeholm America, Inc., 247 F.3d at 96).

A.  Equitrans's Breach of Contract Claims (Count I)

For purposes of its summary judgment motion, Equitrans defines its breach of contract claim in terms of five separate breaches – namely, Precision's: (1) failure to comply with its warranty obligations; (2) refusal to indemnify Equitrans for losses arising out of Precision's

work; (3) commencement of work despite having failed to familiarize itself with the conditions

affecting construction; (4) representation to Equitrans, by commencing and proceeding with the

work, that it "accepted" the surface and subsurface conditions as is; and (5) failure to restore

roads bonded by Equitrans for Precision's use. (Pl.'s Mot. Summ. J. at ¶ 26, Doc. 36.) Items (1)

and (2) are essentially redundant of the breach of warranty and indemnity claims at Counts II and

III of the complaint and will be addressed in connection with those claims.

Items (3) and (4) are based on Equitrans's interpretations of Sections 9.3 and 9.7 of the

MSA and portions of Precision's April 8, 2011, proposal for the Project (Pl.'s Ex. P, Doc. 39-9.)

According to Equitrans, these various provisions set forth Precision's "clear and undisputed

duties under the Contract" (Pl.'s Mem. Supp. Mot. Summ. J. at 6, Doc. 37), whereby Precision:

- agreed that  its "start of the Work constitute[d] its acceptance of the existing surfaces and conditions" (MSA at § 9.7);

- promised to "inspect all surfaces prior to commencing work" (MSA at § 9.7);

- represented that it had "familiarized itself with: (A) The conditions affecting construction at the Project site where the Work is to be performed" (MSA at § 9.3);

- acknowledged it had "thoroughly reviewed [Equitrans' Requests for Quote] ... and the general and local conditions particularly those bearing upon: transportation, disposal, handling and storage of materials; availability of roads, the topography and conditions on the ground; ...and all other matters upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under the RFQ.  ... All dimensions shall be field checked by [Precision].  Any failure by [Precision] to acquaint themselves with all the available information will not relieve [Precision] from responsibility for estimating properly the difficulty or cost to successfully perform the work..." (Precision's proposal for the Project, Doc. 39-9 at p. 20);

- affirmed it would "not commence work until deficiencies and other surface/subsurface conditions that would adversely affect the integrity of [its] completed Work have been corrected" (MSA at § 9.7); and

- promised to "inform [Equitrans] immediately should any surface/subsurface be unacceptable to commence or continue the work" (MSA at § 9.7).

(See Pl.'s Mem. Supp. Mot. Summ. J. at 6-7, Doc. 37.)  Equitrans posits that, by virtue of these

contractual representations, Precision assumed *total* responsibility for the ground surface and

subsurface conditions where it performed its work.  Specifically,

> [i]f there was a deficiency or other surface/subsurface condition which would
> affect the integrity of its Work, Precision was to bring it to Equitrans' attention.
> At that point, the deficiency or other surface/subsurface condition which would
> affect the integrity of Precision's completed Work would be corrected.  Once
> Precision started its Work, it represented to Equitrans its acceptance of the
> existing surfaces and subsurface conditions of the Project site/route.

(Pl.'s Mem. Supp. Mot. Summ. J. at 7, Doc. 37.)

Preliminarily, the Court concludes that, although these provisions may have relevance in

the context of Equitrans's breach of warranty claim, they cannot form the basis of an

independent breach of contract claim, because the parties' June 2013 Settlement Agreement

effectuated a release of Equitrans's then-existing claims, other than its claims for breach of

warranty and indemnity obligations.  At the time the parties entered into the Settlement

Agreement, there were a number of outstanding disputes between them relative to Precision's

work on the Project.  Specifically, Equitrans was holding $9,344,733.00 in retainage from

Precision. (See Def.'s Ex. 8-97, Doc. 43-28.)  Precision had submitted numerous "requests for

information" (RFIs) in which it sought additional compensation for work that Precision

considered to be outside the scope of work called for by the Contract.  (Id.)  Certain of

Precision's RFIs had been approved by Equitrans and others had been rejected.  (Id.)  In

addition, Precision had filed claims for mechanic's liens against Equitrans in Greene County,

Pennsylvania and Wetzel County, West Virginia.  (Id.)  In order "to put to rest all further

controversy, to compromise their claims and differences ..., and to effect the release of all claims

which have been, or might have been, asserted by or against each of them," (id.), the parties

entered into the Settlement Agreement.  The agreement's "recitals" expressly acknowledge the

parties' intent "to release any and all claims each may have against any Party relating in any way to the Project and the Contract with the exception of warranty claims and indemnity claims..." (Id.) To that end, the agreement contains a broad release clause, applicable to "any and all claims... and causes of action of every nature and description whether known or unknown... [that the parties] have or may have from the beginning of time up to and including the date [of the Settlement Agreement], relating in any way to the Contract, the Pennsylvania Lien, the West Virginia Lien, the Project and/or the Dispute, with the exception of the warranty and indemnity claims..." (Id. at ¶ 8)

Based on the unambiguous language of the Settlement Agreement, it is clear that the parties intended to release any breach of contract claims, other than those for alleged breaches of warranty or indemnity obligations, that existed as of the date of the Settlement Agreement. Accordingly, judgment for Precision is appropriate to the extent Equitrans is asserting non-warranty breach of contract claims based on: (a) Precision's failure to familiarize itself with the conditions affecting construction prior to commencing its work and/or (b) Precision's "representation" to Equitrans, by commencing and proceeding with the work, that it "accepted" the surface and subsurface conditions of the Project site.[4]

Equitrans also bases its breach of contract claim on Precision's failure to restore roads that were bonded by Equitrans for Precision's use. Precision argues that certain aspects of Equitrans's damages claim in this regard are barred by the June 2013 Settlement Agreement. In particular, Precision challenges Equitrans's requests for damages relative to, among other things, road repair work that was completed and invoiced by Pennoni & Associates, Inc. ("Pennoni")

---

[4] To reiterate, although the Court is concluding that Plaintiff cannot maintain a separate, non-warranty breach of contract claim premised upon alleged breaches of MSA §§ 9.3 and/or 9.7, the Court notes that these provisions are still relevant to the extent they shed light on the intended scope and meaning of the applicable warranty provisions.

prior to the date of the Settlement Agreement. As the Court discusses in more detail below in connection with Equitrans's indemnity claim, it is not clear from the present state of the record the extent to which these "Pennoni Claims" form the basis of Equitrans's third-party indemnity claims, which presumably were not waived by the Settlement Agreement. Consequently, to the extent Precision is moving for summary judgment relative to any breach of contract claims premised on payments made by Equitrans for road repairs, existing issues of material fact render summary judgment inappropriate.

     B. <u>Equitrans's Warranty Claims (Count II)</u>

Following the completion of the pipeline's construction, twenty-nine (29) slides occurred along parts of the right-of-way that Equitrans had obtained for purposes of the construction. (DSMF at ¶ 19.) In Count II of the Complaint, Equitrans alleged that Precision has "breached its warranty obligations by failing to repair the slope failures when notified of the same. ..." (Compl. at ¶ 40.)

Equitrans's breach of warranty claim is based on MSA Section 8.1 and Article 64 of the Project Specifications. With regard to MSA Section 8.1, Equitrans interprets this provision as encompassing two separate warranties. The first sentence states that "Contractor warrants its Work against all deficiencies and defects in materials and/or workmanship and as required for [sic] in the Contract Documents." (MSA at § 8.1, Def.'s Ex. 8-19, Doc. 43-8.) Equitrans interprets this sentence as a promise by Precision that there will not be any defects or deficiencies in its workmanship or its materials, without any reference to a time limitation. The second sentence of Section 8.1 states that "Contractor shall guaranty or warrant its Work for a period of one (1) year from the date of substantial completion of its Work." (<u>Id.</u>) Equitrans interprets this sentence as a separate, "bumper-to-bumper" guarantee and warranty of Precision's

12

"work" that lasts for one year but is not limited to whether a slide or other defect was caused by defective workmanship or materials. Equitrans maintains that any slope failure and/or slip or slide is a deficiency in Precision's "work" and, since all of the slides at issue occurred within the one-year time period following completion of its work, Equitrans reasons that all of the slides are covered by the "second warranty" in Section 8.1.

Article 64 of the Specifications states that the "Contractor shall warrant all earthwork for a period of fifteen (15) months after the retention has been accepted," and "[e]arthwork shall cover all trench subsidence, any slips or slides and excessive erosion attributable to the improper installation of erosion control devices." (Project Specification Art. 64, Def.'s Ex. 8-25, Doc. 43-10.) Equitrans maintains that, under the plain language of Article 64, "any" slip or slide constitutes a breach of Precision's earthwork warranty; thus, by refusing to repair the slope failures that occurred within the warranty time frame, Precision breached its warranties.

By contrast, Precision maintains that the warranty provisions in question apply only to defects in its workmanship and materials. Precision concedes that there are issues of fact as to whether defects in its workmanship were responsible for two of the "slides" at issue -- namely, the Watson West slide at Milepost 8.57-8.64 ("Watson West") and the Marisa sinkhole at Milepost 10.13 (the "Marisa Sinkhole").[5] Accordingly, it does not seek summary judgment relative to these two "slides."

As for the other twenty-seven (27) slope failures, however, Precision maintains that there is no evidence to establish that these slides resulted from defects in its workmanship or materials. Precision contends that Equitrans has failed to proffer any expert testimony concerning the cause

_____

[5] As suggested by its name, the Marisa Sinkhole is not a slope failure. However, Precision does not presently dispute that the Marisa Sinkhole constitutes an item potentially covered by the terms of its warranty.

for the slope failures with respect to ten (10) of the slides – i.e., those numbered "20 through (29)" in Precision's Exhibit 9 (Doc. 43-31) and pertaining to the Shultz, Marling, Ankrom, Raymont, Tennant, Minor, Efaw, and Fairbanks properties as well as Mileposts 0.26-0.53 and 0.33 at Underwood property.  With respect to the remaining seventeen (17) slides -- denoted as numbers 1,2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19 in Precision's Ex. 9 (Doc. 43-31) (hereafter, the "Disputed Slides"),[6] the parties have presented competing theories as to the root causes of these slope failures, but Precision contends that neither theory can support a finding of liability on its part.

In his expert report submitted on behalf of Precision, Steven Pasternack, P.E., Ph.D., opines that the slope failures were caused by: (a) the pipeline being routed on overly steep slopes and (b) the rights-of-way being located over old landslides, active landslides, or soil and rock susceptible to landslides.  (Pl.'s Ex. I, Doc. 39-5.)  Precision maintains that, under the terms of the Contract, it was not responsible for these conditions.  On the other hand, Equitrans's expert witness, Jon D. Raab, P.E., opined that the slope failures were attributable to Precision's workmanship, including its selection of inadequate means and methods to reconstruct stable slopes and its failure in some cases to use engineered stability measures.  (Def.'s Ex. 8-67, Doc. 43-15.)  Precision interprets Mr. Raab's report and testimony as establishing that, with regard to each of the 17 Disputed Slides, the slopes required additional engineered stability measures because they were steeper than a ratio of 2H:1V.  Precision insists that it had no responsibility under the Contract for such measures and that all engineering and design responsibility for slide mitigation measures rested with Equitrans.  Accordingly, Precision maintains that the record

---

[6] These Disputed Slides pertain to slope failures at the following properties:  Watson (East and Central), Gilbert (North and South), Reserve Coal, Fretts, Milk, Minor, Wiley Fork (Lower/North, Central, and Upper/South), T. Parks/Coastal Lumber, Parks, E. Clark (Mobley Run), Underwood (Mileposts 0.01 and 0.05-0.10), and Titus.

cannot support a finding of any warranty liability on its part relative to the seventeen Disputed Slides.

Precision's interpretation of MSA Section 8.1 and Article 64 as warranting only against defects in workmanship and materials holds some appeal. This Court is inclined to agree that the more logical interpretation of Section 8.1 is that the first sentence merely describes the breadth or scope of the warranty (i.e., a warranty against defects in materials and workmanship), while the second sentence describes its length (i.e., one year from substantial completion). To interpret the second sentence as a distinct, stand-alone warranty whereby Precision broadly guaranteed or warranted its work would render the first sentence's warranty against defects in workmanship superfluous. This would violate the fundamental principle of contract interpretation that every phrase of a contract should be given meaning and none should be treated as surplusage if any other construction of the contract is rationally possible. See Riverside Sch. Dist. v. Career Tech. Ctr., 104 A.3d 73, 876 (Pa. Commw. Ct. 2014) (citation omitted). To avoid this problem and give meaning to both clauses, Equitrans suggests that the "second warranty" (i.e., the bumper-to-bumper unconditional guarantee of Precision's work) lasts only one year, whereas the "first warranty" relating to workmanship does not reference any time limit. However, it seems unlikely that the parties, having assigned a particular time limit to one warranty, would fail to assign a time limit to the other. Nor does it seem likely that Precision intended to provide an interminable warranty relative to its workmanship.

Precision's proposed interpretation of MSA Section 8.1 is buttressed by the language in Article 64, which similarly appears to restrict Precision's earthwork warranty to issues of defective workmanship. Equitrans's assertion that Article 64 obligates Precision to repair "any slips or slides" irrespective of their cause ignores the last sentence of the provision, whereby

Precision "agree[d] to remobilize to repair any earthwork or piping defect **within fourteen (14) calendar days** after receiving written notification *that a project defect is attributable to the Contractor's workmanship or materials*." (Project Specification Art. 64, Def.'s Ex. 8-25, Doc. 43-10 (italicized emphasis supplied).) Equitrans's interpretation of Article 64 appears to ignore this express contractual provision, which cannot be written out of the contract or disregarded by the Court. See Neuhard v. Range Resources Appalachia, LLC, 29 F. Supp. 3d 461, 474 (M.D. Pa. 2014). Nor does it seem likely that the parties intended to create two separate earthwork warranties whereby Precision would remobilize for repairs within 14 days for cases involving defective workmanship, but would be under no particular time constraints with respect to non-workmanship-related repairs.

Thus, the Court is inclined to agree with Precision that MSA Section 8.1 and Article 64 of the Specifications imply warranties related to workmanship, as opposed to an absolute warranty against slope failures irrespective of their cause. Nevertheless, even if the Court accepts Precision's interpretation of the warranty provisions as limiting its liability to defects in workmanship, this does not entirely end the matter, because the Court must consider what Precision's contractual "workmanship" responsibilities entailed. Fundamentally, the parties disagree concerning the extent to which the Contract imposed responsibility on Precision for ensuring adequate earthwork stabilization measures.

As to this issue, the Court perceives an ambiguity in the Contract which cannot be resolved as a matter of law at the summary judgment stage. Precision maintains that its only responsibilities under the Contract were to construct what Equitrans designed. To support its position, Precision points to the testimony of Equitrans's project manager and Equitrans's filings with the Federal Energy Regulatory Commission as evidence that Equitrans was responsible to

design any necessary slide mitigation measures but failed to incorporate such measures into its design. Precision also interprets Mr. Raab's report and testimony as establishing that, with regard to each of the 17 Disputed Slides, the terrain required additional engineered stability measures beyond those that were incorporated into Equitrans's design. Precision insists that it cannot be held contractually liable for any defects in Equitrans's design, since it was obligated to adhere to that design.

On the other hand, Equitrans has produced some evidence supportive of its position that Precision assumed contractual responsibility relative to earthwork mitigation measures. As previously discussed, Section 9.7 of the MSA, entitled "Quality of Work," ostensibly obligated Precision to inspect all surfaces prior to commencing its work, immediately inform Equitrans of any "unacceptable" surface or subsurface conditions, and refrain from commencing work "until deficiencies and other surface/subsurface conditions that would adversely affect the integrity of Contractor's completed work have been corrected." (Id.) Under the terms of this provision, the "Contractor's start of the Work constitute[d] Contractor's acceptance of the existing surfaces and conditions." (Id.) Similarly, under Section 9.3 of the MSA, Precision represented that it had familiarized itself with, and accepted, conditions affecting construction at the project site where its work was to be performed. In addition, Section 9.9 of the MSA required Precision to give Equitrans "prompt written notice" of any "Company Furnished Property" -- including any specifications, drawings, designs, schematics, and technical information – that Precision found to be defective. (MSA at § 9.9(F).) Collectively, these provisions provide some evidence that the parties intended Precision to bear the responsibility of identifying and addressing inherently unfavorable surface or subsurface conditions that might affect the integrity of its work so that enhanced stability measures could be employed. In addition, Article 45 of the Project

Specifications addresses Precision's responsibility to recontour the project areas to their original condition and, to that end, it recognizes that "[s]tabilization of disturbed slopes may require the Contractor to determine and install sufficient mitigation... to guarantee that slips will not occur." (Def.'s Ex. 8-25, Doc. 43-10.)

Precision argues that, under the "Spearin doctrine," Equitrans's impliedly warranted the suitability of its design specifications, and Equitrans cannot rely on "boilerplate" contractual provisions to shift responsibility to Precision for defects in Equitrans's design. See United States v. Spearin, 248 U.S. 132, 136–137 (1918) ("[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications."); E. Elec. Corp. of New Jersey v. Shoemaker Const. Co., 657 F. Supp. 2d 545, 558-59 (E.D. Pa. 2009) ("According to Pennsylvania law, an owner impliedly warrants the accuracy and completeness of the plans and specifications that it furnishes to the Contract.") (citing Rhone Poulenc Rorer Pharmaceuticals, Inc. v. Newman Glass Works, 112 F.3d 695 (3d Cir.1997)). Thus, a contractor is generally not liable for simply performing work in accordance with owner-issued design specifications. See A.G. Cullen Construction, Inc. v. State System of Higher Education, 898 A.2d 1145, 1156–57 (Pa. Commw. Ct.2006).

However, this doctrine only applies where the contractor relies on the owner's design specifications. Design specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is required to follow them as one would a road map." A.G. Cullen, 898 A.2d at 1156. In contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that

objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Id.; see also Aquatrol Corp. v. Altoona City Auth., 296 F. App'x 221, 224 (3d Cir. 2008).

Here, Equitrans argues that it did not provide any design specifications that specifically related to earthwork. Equitrans further contends that the construction "typicals" it provided in its FERC filings were in the nature of performance specifications and that Precision exercised substantial discretion in performing the earthwork. As noted, Article 45 of the Project Specifications addresses Precision's responsibility to recontour the project areas to their original condition and, to that end, it recognizes that "[s]tabilization of disturbed slopes may require the Contractor to determine and install sufficient mitigation... to guarantee that slips will not occur." (Def.'s Ex. 8-25, Doc. 43-10.) Although Precision has provided fairly compelling evidence that it lacked any design responsibilities relative to the Project, the Court concludes that Equitrans has proffered at least enough evidence to demonstrate an ambiguity in the contract concerning the scope of Precision's workmanship responsibilities as it pertains to slide mitigation measures. As previously noted, where a contractual ambiguity exists, the fact-finder must determine its meaning. Pac. Employers Ins. Co., 693 F.3d at 426.

In addition, the Court concludes that factual issues as to the cause of certain slope failures cannot be resolved as a matter of law at the summary judgment stage. Although Precision claims that Mr. Raab testified unequivocally that the lack of additional engineered stability measures were the ultimate cause of the slope failures at the seventeen Disputed Slides, the Court does not interpret Mr. Raab's testimony as completely unequivocal in this regard. In actuality, Mr. Raab opined that such measures were "likely" required for areas exceeding a 2H:1V slope, but this was not a "definitive threshold," and the need for additional measures would entail an

individualized inquiry on a "case-by-case basis" depending on the degree to which a slope exceeded a 2H:1V ratio. (Raab Dep. at 99-102, Doc. 43-5.) Based on information obtained from Equitrans's project manager and the language of the Contract documents, Mr. Raab agreed that Precision assumed design responsibilities with regard to earthwork and recontouring (see Raab Report at 3-6, Doc. 43-15; Raab Dep. at 69, Doc. 50-5), and he opined that numerous workmanship issues caused or influence the instability at the Disputed Slides, including (among other things): the quality of the fill used at the various slide sites, the placement of additional fill over steep natural slopes, the placement of fill on steep slopes without appropriate benching, and inadequate control of groundwater and seepage. To the extent Mr. Raab's testimony contains internal inconsistencies or is contradicted by other evidence of record, these are matters for the fact-finder to assess in determining his credibility. Given the disputed expert opinion evidence concerning the cause of the seventeen Disputed Slides, the ambiguities in the Contract concerning Precision's responsibilities relative to earthwork mitigation design, and the highly technical nature of these inquiries, the Court is not in a position to resolve the pending cross-motions based on the current state of the record. Accordingly, the parties' cross motions for summary judgment will be denied relative to Count II of the Complaint insofar those motions relate to the seventeen Disputed Slides, the Watson West Slide, and the Marisa Sinkhole.

That having been said, the Court agrees with Precision that it is entitled to judgment relative to the remaining ten (10) slides designated as numbers "20 through (29)" in Precision's Exhibit 9 (Doc. 43-31) that occurred at the Shultz, Marling, Ankrom, Raymont, Tennant, Minor, Efaw, and Fairbanks properties as well as Mileposts 0.26-0.53 and 0.33 at Underwood property. The Court agrees that the cause of these slope failures is a matter involving specialized or technical knowledge as to which expert testimony is required. Because Equitrans failed to

proffer any expert opinion as to the cause of these slides, and because the existing evidence of record is otherwise insufficient as a matter of law to establish that the cause of these slides was attributable to defects in Precision's workmanship, Precision is entitled to judgment on Count II insofar the warranty claim is premised on these particular slope failures. [7]

C.  Plaintiff's Indemnity Claims (Count III)

In Count III of the Complaint, Equitrans asserts a claim for breach of Precision's indemnity obligations arising out of its failure to indemnify Equitrans for certain repairs. (Compl. at ¶ 40.)  In moving for summary judgment on this claim, Equitrans notes that, under Section 12.1 of the MSA, Precision is obligated to indemnify Equitrans for any "damages,...losses,...costs and expenses" arising out of Precision's "Work or other performance under [the MSA] and/or attributable to ... "breach by Contractor of any representation or warranty" or "Contractor's failure to comply with any provision of [the MSA] or the Contract Documents."  (MSA at § 12.1, Def.'s Ex. 8-19, Doc. No. 43-8.)  Equitrans argues that, due to Precision's breach of its contractual obligation to perform slope repairs along the pipeline right-of-way, Equitrans incurred costs in securing the repairs itself.  Consequently, Equitrans argues that it incurred "damages, losses, costs and expenses" due to Precision's "work" or other performance under the contract, entitling Equitrans to recover all "damages, losses, costs and expenses" (including attorney fees) resulting from the breach of Precision's indemnity obligations.

---

[7] For the same reason, Equitrans cannot establish any breach of Precision's indemnity obligations relative to these ten slides, so judgment will be entered in Precision's favor on Count III to the extent that Equitrans's indemnity claim is premised on costs it incurred in repairing these slides.

Precision maintains that the language of the MSA's indemnification clause clearly limits Precision's obligations to situations involving third-party claims. The undersigned finds this argument persuasive for a number of reasons.

First, Section 12.1 expressly requires Precision to "defend, indemnify, and hold [Equitrans] harmless" from and against "any claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including attorneys' fees and other costs of defense..." Courts in this circuit have recognized that the terms "defend, indemnify, and hold harmless" indicate an intent to restrict indemnification obligations to third party claims. See, e.g., Travelers Indem. Co. v. Dammann & Co., 594 F.3d 238, 255 (3d Cir. 2010) (holding that a party's duty to "indemnify" must be interpreted in relation to the accompanying words "defend" and "hold harmless," and "the only sensible reading of [the] clause evidences a requirement that third-party liability exist for the clause to be triggered")[8]; Exelon Generation Co., LLC v. Tugboat DORIS HAMLIN, Civil Action No. 06-0244, 2008 WL 2188333, at *2 (E.D. Pa. May 27, 2008) (finding that "a common sense reading" of an indemnification provision requiring defendant to "indemnify, hold harmless and defend" the plaintiff "suggest[ed] that it refers only to third-party claims"); see also Atlantic City Assoc., LLC v. Carter & Burgess Consultants, Inc., 453 F. App'x 174, 180 (3d Cir. 2011) (noting that Travelers Indem. Co. "foreclosed" the argument that indemnification clauses might apply to first-party disputes between parties to a contract); Kellers Sys., Inc. v. Transport Int'l Pool, Inc., 172 F. Supp. 2d 992, 998-99 (N.D. Ill. 2001) (concluding that, under Pennsylvania law, an

---

[8] Although the Court in Travelers Indem. Co. interpreted the applicable indemnification language under New Jersey law, its analysis is instructive in this case because the relevant principles of contract construction that were applied in Travelers mirror the principles of contract construction that apply in this case under Pennsylvania law.

indemnification provision requiring a party to "defend" and "hold harmless" was limited to third-party claims).

Second, Section 12.1's reference to "claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including attorneys' fees and other costs of defense" supports the conclusion that only third-party claims are covered by the provision. This is particularly true given the provision's reference to "other costs of defense," which appears to modify the prior list of items.

Third, Pennsylvania law requires that indemnity clauses be construed narrowly against the party seeking indemnification. See Dunkin' Donuts Franchising, LLC v. Claudia I, LLC, No. CIV.A. 12-2010, 2014 WL 7008593, at *3 (E.D. Pa. Dec. 12, 2014) (citing Jacobs Constructors, Inc. v. NPS Energy Servs., Inc., 264 F.3d 365, 371 (3d Cir.2001)). This consideration also favors Precision's interpretation of Section 12.1 as being limited to situations involving third-party claims.

Finally, Precision correctly notes that certain other indemnity provisions in Article 12 of the MSA only make sense in the context of third-party claims. See, e.g., MSA at § 12.2 (addressing Precision's indemnity obligations in the context of intellectual property infringement claims); MSA at § 12.3 (providing an exception to Precision's "defense and indemnification obligations" in cases involving Equitrans' willful misconduct or sole negligence); MSA at § 12.4 (providing that Precision's "defense" of the Indemnitee "shall be undertaken with counsel acceptable to the Indemnitee [being] represented"); MSA at § 12.5 (waiving any rights Precision might have under workers' compensation statutes or similar laws to limit its indemnity obligations or avoid being joined as an additional defendant). Based on the foregoing considerations, the Court agrees with Precision that the clear and unambiguous language of MSA

Section 12.1, when read in conjunction with other contractual provisions, limits Equitrans's indemnity rights to situations involving third-party claims.

That having been said, the Court notes that Equitrans maintains that it has valid third-party claims based on expenses it incurred to rectify slope failures and to make necessary road repairs. At the same time, Precision has challenged Equitrans's requests for damages relative to (i) certain road repair work completed and invoiced by Pennoni & Associates, Inc. ("Pennoni") prior to the date of the Settlement Agreement (hereafter, "Pennoni Claims"); and (ii) certain payments made to various landowners and townships as set forth under category "806" on Precision's Exhibit 70 (Def. Ex. 8-70, p.1, Doc. 43-17) ("Township & Landowner Claims"). Precision contends that most of the invoices documenting payments on the Pennoni Claims predated the Settlement Agreement and thereby are within the category of claims waived by Equitrans pursuant to Paragraphs 6 and 8 of the Settlement Agreement. Similarly, Precision argues that certain payments made by Equitrans to landowners Kathy and Timothy Fretts, as well as to Jefferson and Gilmore Townships, predate the Settlement Agreement and are among the claims waived by the Settlement Agreement. Precision acknowledges that these Township & Landowner Claims encompassed payments made for various reasons, including "road repair," "road maintenance," and "property damage," among other things. According to Precision, some or all of these payments constituted the "claims and back charges that Equitrans had against Precision" as of April 2013. (See Brandli Dep. Vol. II at 323:18-326-10.) Precision therefore seeks summary judgment with respect to any damage claims by Equitrans that relate to Pennoni Claims or Township & Landowner Claims that existed prior to the date of the Settlement Agreement.

What is not presently clear from the record is the extent to which any of these alleged damages can legitimately form the basis of Equitrans's third-party indemnification claims. Although Paragraphs 6 and 8 of the Settlement Agreement released a broad category of then-existing claims, the agreement also expressly reserved Equitrans's right to pursue past and future warranty and indemnity claims. Because the Court perceives issues of fact relative to Equitrans's purported third-party claims that are not capable of disposition on the present record, the Court will not presently grant either party's motion for summary judgment relative to Count III insofar as it is premised on the Pennoni Claims or the Township & Landowner Claims.

Finally, the Court notes that Precision has challenged Equitrans's request for attorney fees. These fees appear to be an element of Equitrans's indemnity claim, since the indemnity clause provides the only apparent contractual basis for recovery of attorney's fees. Because the Court is declining to dispose of the indemnity claim definitively at the present time, however, it is premature to dispose of Equitrans's attorney fee request, and Precision's motion in that regard will therefore be denied.

D. Precision's Counterclaim

In its responsive pleading (Doc. 6), Precision asserted counterclaims against Equitrans for breach of contract (Count I) and an alleged violation of Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. §§ 501 et seq. (Count II). These claims are based on Paragraph 4 of the Settlement Agreement, pursuant to which Equitrans withheld $987,875.20 of the retainage and agreed to release same "after all warranty items have been addressed by Precision as provided by the Contract." (Settlement Agreement at ¶ 4, Def.'s Ex. 8-97, Doc. 43-28.)

In its counterclaims, Precision alleged that "all warranty items [had] been completed" and "no further warranty items could arise that would justify withholding the payment." (Countercl. at ¶ 10, Doc. 6.)

Equitrans has moved for summary judgment on both of Precision's counterclaims. Equitrans acknowledges that it refused to release the $987,875.20 retainer that was withheld under the terms of the June 2013 Settlement Agreement; however, it maintains that its actions were appropriate because Precision's refusal to repair the slides on the Project demonstrate that all "warranty items" have not been addressed.

In responding to Equitrans's motion, Precision did not address or otherwise attempt to defend its counterclaims. Consequently, the Court deems Equitrans' motion for summary judgment to be unopposed relative to Precision's two counterclaims, and judgment will be entered in Equitrans's favor accordingly. See Nykiel v. Borough of Sharpsburg Police Dep't, 778 F. Supp. 2d 573, 578 (W.D. Pa. 2011) (a party's failure to address arguments against its claims in its response to a motion for summary judgment constitutes an "abandonment" of those claims) (citing authority).

## II. ORDER

Consistent with the foregoing, Equitrans's motion for summary judgment (Doc. 36) will be granted insofar as it relates to Precision's counterclaims for breach of contract and Equitrans's alleged violations of the Contractor and Subcontractor Payment Act. In all other respects, Equitrans's motion will be denied.

Precision's motion for partial summary judgment (Doc. 40) will be granted with respect to the breach of contract claims asserted in Count I of the Complaint that are not founded on breach of warranty or indemnity theories. With respect to the breach of warranty claim in Count

II of the Complaint, Precision's motion will be granted as to the slides numbered "20" through "29" in Precision's Exhibit 9 (Doc. 43-31) and pertaining to the Shultz, Marling, Ankrom, Raymont, Tennant, Minor, Efaw, and Fairbanks properties as well as Mileposts 0.26-0.53 and 0.33 at Underwood property.  With respect to the indemnity claim in Count III of the Complaint, Precision's motion will be granted as to all claims premised exclusively on Equitrans's first party losses and/or any losses incurred relative to the aforementioned slides numbered "20" through "29" in Precision's Exhibit 9 (Doc. 43-31).  In all other respects, Precision's motion for partial summary judgment will be denied.

      **IT IS SO ORDERED**.


                    <ins>s\Cathy Bissoon</ins>
                    Cathy Bissoon
                    United States District Judge


December 31, 2015

cc (via e-mail):

All counsel of record